## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ALICE SOWDERS, DVM d/b/a FAIRBORN ANIMAL HOSPITAL, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) | No. |
| Plaintiff, | ) ) | |
| v. | ) ) | **CLASS ACTION** |
| SCRATCH FINANCIAL, INC., | ) ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Alice Sowders, DVM d/b/a Fairborn Animal Hospital ("Plaintiff"), brings this action on behalf of itself and a class of all other persons similarly situated and, except as to those allegations pertaining to Plaintiff or its attorneys, alleges the following upon information and belief against defendant Scratch Financial, Inc. ("Scratch"):

## PRELIMINARY STATEMENT

1. Scratch sent unsolicited advertisements by fax to Plaintiff and others.

2. On behalf of itself and a class of all others similarly situated, Plaintiff alleges claims and seeks statutory damages and other relief

arising from Scratch's violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA").

3.     The TCPA prohibits sending any unsolicited advertising material by facsimile. 47 U.S.C. § 227(a)(4) ("any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission").

4.     A true and correct copy of a facsimile Plaintiff received from Scratch on February 20, 2019, is attached as Exhibit A.

5.     Plaintiff received Exhibit A on its fax machine.

6.     Exhibit A advertises the commercial availability or quality of Scratch's property, goods, or services.

7.     Scratch did not have prior express invitation or permission to send any advertising material to Plaintiff by fax.

8.     Plaintiff had no "established business relationship" ("EBR") with Scratch.

9.     Because Exhibit A has no compliant opt-out notice, any EBR between Scratch and any other fax recipient would be irrelevant in this action.

10. The TCPA creates a private right of action and provides minimum statutory damages of $500 per violation. If the Court finds a violation was willful or knowing, it can increase the damages up to three times, or $1,500 per violation. The Court can also grant injunctive relief to protect against future violations. 47 U.S.C. § 227(b)(3).

11. Unsolicited facsimiles cause concrete damage to their recipients, including wasting their valuable time, interrupting their privacy, using or tying up telephone lines, preventing fax machines from receiving authorized faxes, preventing fax machines from sending outgoing faxes, wasting paper and ink toner printing the unsolicited advertising material, causing undue wear and tear on fax machines, requiring additional labor to attempt to discern the source and purpose of the unsolicited message, or otherwise using the recipient's valuable and limited resources to deliver Scratch's unsolicited, targeted advertisement.

12. On behalf of itself and all others similarly situated, Plaintiff seeks statutory damages and other relief for each of Scratch's violations of the TCPA occurring during the statutory limitations period commencing four years prior to the filing of this action and continuing

until the Court orders notice to the class.

## PARTIES, JURISDICTION, AND VENUE

13.    Fairborn Animal Hospital is the registered business name of Dr. Alice Sowders' veterinary clinic operating at 2116 Park Hills Dr, Fairborn, Greene County, OH 45324.

14.    Scratch Financial, Inc., is a Delaware for-profit corporation, with its principal place of business located at 225 S Lake Ave, Ste 250, Pasadena, CA, 91101. Scratch is registered to do business in the State of Ohio and its registered agent is Business Filings Incorporation, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219.

15.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227.

16.    Personal jurisdiction exists over Scratch in Ohio because it is registered to do business in the State, and it has committed tortious acts in the State by sending unlawful advertisements by fax to Plaintiff and other Ohio residents.

17.    Venue is proper in the Southern District of Ohio, because Scratch committed statutory torts within this District, has its registered

agent in this District, and a significant portion of the events took place here.

## **FACTS**

18.     Scratch is a financial technology company connecting patients and medical practices in the "care now, pay later" economy.

19.     Scratch offers financing to patients desiring elective human healthcare and to pet owners seeking pet care, while offering to refer patients and pet owners to appropriate providers in exchange for a percentage of their fees. *See, e.g.,* https://get.scratchpay.com/ (last visited 2/16/23).

20.     Scratch was founded in 2016 with "Scratchpay," a "care now, pay later" product it has described as helping pet owners afford pet care while allowing veterinary health providers to grow revenues and reduce accounts receivable.

21.     In 2020, Scratch expanded its services to support more human elective medical providers like dental, optical and chiropractic services.

22.     To healthcare providers, Scratch offers to help "Your practice [to] get[] paid faster. Scratch direct deposits funds to your bank in 2-3 business days." *Ibid.*

23.    Scratch touts that its financing options will get providers more patients. "You'll be ready to start saying yes to more patients in no time." *Ibid.*

24.    Scratch sent facsimiles like Exhibit A to health providers seeking to encourage them to sign up with Scratch, consent to Scratch's standardized agreements, and do business with Scratch.

25.    Exhibit A advertises the commercial availability of Scratch's property, goods, or services by saying, for example, "Offer your clients a simpler financing solution! Sign up your clinic now for free!" Exhibit A.

26.    Exhibit A says Scratch will charge the veterinarian "5% Simple, flat-fee pricing … regardless of which plan your client chooses." Exhibit A.

27.    Exhibit A advertises the quality of Scratch's services by saying, for example, "Customer satisfaction higher than 95% of all Fortune 500 companies." Exhibit A.

28.    Exhibit A advertises SCRATCHPAY, a registered trademark and logo of Scratch Financial, Inc.

29.    Exhibit A directs recipients to Scratch's website, scratchpay.com/fax. Exhibit A.

30.    At scratchpay.com/fax, a visitor is encouraged to register their practice to offer Scratchpay: "Registering your practice to offer Scratchpay is <u>free</u> and takes 2 minutes — no commitments, no obligations to use the service and no long-term contracts." https://my.scratchpay.com (last visited 2/20/23).

31.    To register, a provider must agree to Scratch's Program Agreement for U.S. Providers ("Program Agreement" attached hereto as <u>Exhibit B</u>).

32.    The Provider Agreement requires providers to advertise for Scratch. <u>Exhibit B</u>. They must "display Scratchpay-approved point-of-sale signage, online logos or other online or offline displays relating to the Program as required by Scratchpay ("Scratchpay Marketing Materials"). Provider may not make any changes to such Scratchpay Marketing Materials without Scratchpay's prior written approval." <u>Id</u>.

33.    Providers must provide financial statements to Scratchpay. "At initial registration, and upon Scratchpay's request thereafter from time to time, Provider agrees to provide Scratchpay with all information, including Provider's financial statements (collectively, "Provider Information")." <u>Exhibit B</u>.

7

34.     Scratch's website advertises, "Your practice gets paid faster. Scratch direct deposits funds to your bank in 2-3 days." https://get.scratchpay.com/ (last visited 2/16/23), but the Provider Agreement clarifies that payment is remitted within 5 business days. "Upon receiving an Authorization, Scratchpay will remit the Settlement Amount to the Provider to the Provider's designated bank account within five (5) business days of authorization ("Settlement")." Exhibit B.

35.     The Provider Agreement gives Scratch full control to credit and debit the Provider's bank account and disallows the Provider from disputing their credits or debits. "Provider authorizes Scratchpay to (i) initiate credit entries and to initiate, if necessary, debit entries and adjustments for any erroneous credit entries, to Provider's bank account, and (ii) initiate debit entries and to initiate, if necessary, credit entries and adjustments for any erroneous debit entries, to Provider's bank account.  Provider agrees not to dispute any credits or debits with its bank for any transfers authorized under this Agreement." Exhibit B.

36.     According to its Provider Agreement, Scratch's Provider Fee varies by market segment, and can be as high as 15%, depending on the services provided:

**PRICING SCHEDULE**

*Effective September 10, 2020*

**For all Scratchpay Payment types, including Pay Over Time, Pay Later and Take 5:**

| Segment | Provider Fee (% of total Scratchpay Payment Amount) |
|---|---|
| Veterinary | 5% |
| Vision/Dental/Medical | 7% |
| Addiction Treatment | 15% |

Exhibit B, p. 27.

37.     Scratch collects finance charges from patients. "Scratch Plans are available in 6, 12, 18, and 24 month terms, range in loan amounts from $150 to $10,000, and with annual percentage rates (APR) ranging from 0% to 36% with the lowest rates for borrowers with exceptional

9

credit scores. Monthly payment amounts on a Scratch Plan will depend on the term length, amount financed, and APR." https://get.scratchpay.com/ (last visited 2/16/23).

38. Exhibit A advertises the commercial availability of Scratch's property, goods, or services on its face.

39. Exhibit A advertises the quality of Scratch's property, goods, or service on its face.

40. Scratch had only a commercial purpose for sending Exhibit A.

41. Scratch sent Exhibit A to advertise to veterinary providers: to motivate them to do business with Scratch, to sign up at its website, to consent to its standard agreements, to become its advertising agents, to see the patients and customers it refers to them, and to permit Scratch to collect fees in the process.

42. Scratch needed, but did not have, express invitation or permission to send advertising material by fax.

43. Before sending advertising material to Plaintiff's fax machine, Scratch did not seek Plaintiff's express invitation or permission.

10

44.    Scratch did not obtain Plaintiff's express invitation or permission before sending advertising material to Plaintiff's fax machine in the form of Exhibit A.

45.    Plaintiff did not have an "established business relationship" or "EBR" with Scratch.

46.    Plaintiff has not signed-up or done business with Scratch.

47.    Because Exhibit A lacks a compliant opt-out notice, the TCPA prohibited Scratch from sending it by fax even to providers with whom it had an EBR, unless it had their prior express invitation or permission.

48.    Plaintiff uses its fax machine to send and receive urgent, important, and confidential information, including pictures and images, but not to send or receive advertising material.

49.    Plaintiff does not advertise its property, goods, or services by fax.

50.    Plaintiff understands that the TCPA prohibits businesses (like Scratch) from sending advertising material by fax without Plaintiff's prior express invitation or permission.

51.    Yet, Plaintiff receives unsolicited advertisements on its fax machine.

52.    Upon information and belief, Plaintiff alleges that Scratch sent Exhibit A and perhaps other unsolicited advertisements by facsimile to more than 40 persons or entities. This allegation is based, in part, on the fact that Exhibit A is a generic form template, with graphics and trademarks and no personalized information about or for the targeted recipient. The header of the fax shows that Scratch sent the fax to a computerized list of targets, predictably lengthy. Sending advertisements in bulk fax broadcasts is an inexpensive way to reach a wide target audience, far less expensive than direct mail, tv, radio, telephone calls, and in-person visits.

53.    Plaintiff and the other class members owe no obligation to protect their fax machines from Scratch's unlawful facsimiles. Their fax machines are ready to send or receive their urgent business communications, or private communications about patients' medical and veterinary needs, not to receive Scratch's unsolicited advertisements.

## <u>CLASS REPRESENTATION ALLEGATIONS</u>

54.    Plaintiff brings this action as a class action on behalf of itself and a class of other persons and entities similarly situated, and initially defined as follows:

> All persons and entities who were sent one or more facsimiles from Scratch Financial, Inc., on or after February 20, 2019, containing any material advertising the commercial availability or quality of Scratch's property, goods, or services, and not including the opt-out notice required by 47 U.S.C. § 227(b)(2)(D), but who did not sign-up or register to do business with Scratch.

Excluded from the class are Scratch, any entity in which Scratch has a controlling interest, Scratch's employees, officers, and directors, Scratch's legal representatives, heirs, successors, and assigns, and any judge assigned to this action, and his or her family.

55.    Except for those persons excluded, this class action includes every other person or entity who was sent one or more of Scratch's unsolicited advertisement by fax.

56.    Plaintiff intends to discover the full scope of Scratch's fax advertising efforts. *See* <u>Exhibit C</u>, a Demand for Preservation of All Tangible Documents Including Electronically Stored Information.

57.    This action is brought, and may properly be maintained as, a class action under Fed. R. Civ. P. 23. This action satisfies Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. Additionally, prosecution of Plaintiff's claims separately from the putative class's claims would create a risk of inconsistent or varying adjudications under Rule 23(b)(1)(A). Furthermore, the questions of law or fact that are common in this action predominate over any individual questions of law or fact making class representation the superior method to adjudicate this controversy under Rule 23(b)(3).

## Numerosity/Impracticality of Joinder

58.    On information and belief, the class includes more than 40 persons and, thus, is so numerous that joinder of all members is impracticable. The precise number of class members and their identities are unknown to Plaintiff, but Plaintiff intends to obtain them in discovery from Scratch's records or the records of third parties.

## Commonality and Predominance

59.    There is a well-defined community of interest and common questions of law and fact that predominate over any question affecting only individual members of the class. These common legal and factual

questions, which do not vary from one class member to another, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to the following:

    a.    Whether Scratch advertised its business to medical providers by fax in bulk broadcasts;

    b.    Whether Scratch's facsimiles contained material advertising the commercial availability or quality of any property, goods, or services;

    c.    The manners and methods Scratch used to obtain or compile the target lists to which it sent facsimiles;

    d.    Whether Scratch sent advertising material by fax without seeking prior express invitation or permission;

    e.    Whether Scratch sent advertising material by fax without first obtaining express invitation or permission;

    f.    Whether Scratch's facsimiles contained an opt-out notice that complied with the TCPA's requirements;

    g.    Whether Plaintiff and the other class members are entitled to statutory damages;

h.      Whether the Court should treble the statutory damages; and

i.      Whether the Court should enjoin Scratch from sending unsolicited advertisements by facsimile in the future without first demonstrating that it has adopted measures and mechanisms to avoid and prevent its employees from engaging in unlawful fax advertising.

## Typicality of Claims

60.    Plaintiff's claims are typical of the claims of the other class members because all were injured by the same wrongful practices. Plaintiff and the members of the class received Scratch's unsolicited advertisements by facsimile. If Plaintiff prevails on its claims, then the putative class members will prevail as well.

## Adequacy of Representation

61.    Plaintiff is an adequate representative of the class. Plaintiff's interests do not conflict with the interests of the class. Plaintiff has retained counsel competent and experienced in complex class action litigation, and TCPA litigation in particular, and Plaintiff intends to

vigorously prosecute this action. Plaintiff and its counsel will fairly and adequately protect the interest of members of the class.

### A Class Action is the Superior Method for Adjudicating the Common Questions of Law or Fact that Predominate over Individual Questions

62. A class action is superior to other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all class members is economically unfeasible and procedurally impracticable. Class members do not have strong interests in individually controlling the prosecution of separate actions. There is no other litigation pending regarding fax advertisements from Scratch. Management of these claims and their resolution as a class action will not be difficult.

### COUNT I

### TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227

63. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

64. Plaintiff brings Count I on behalf of itself and a class of similarly-situated persons.

65. The TCPA prohibits:

any person within the United States, or any person outside the United States if the recipient is within the United States—

\* \* \*

**(C)** to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless--

**(i)** the unsolicited advertisement is from a sender with an established business relationship with the recipient;

**(ii)** the sender obtained the number of the telephone facsimile machine through--

**(I)** the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

**(II)** a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution, except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and

**(iii)** the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); \*\*\*

47 U.S.C. § 227 (b)(1)(C).

66.     The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227(a)(4).

67.     The TCPA provides a "private right of action" as follows:

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State--

**(A)** an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

**(B)** an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

**(C)** both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3).

68.     In relevant part, the TCPA states that "[t]he [Federal Communications] Commission shall prescribe regulations to implement the requirements of this subsection ... in implementing the requirements of this subsection, the Commission shall provide that a notice contained

19

in an unsolicited advertisement complies with the requirements under this subparagraph only if ... (i) the notice is clear and conspicuous ..." 47 U.S.C. § 227(b)(2)(D)(i).

69.     Additionally, "a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if ... (ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful ..." 47 U.S.C. § 227(b)(2)(D)(ii). The shortest reasonable time has been determined to be thirty (30) days. 47 C.F.R. § 64.1200(a)(4)(iii)(B).

70.     The opt-out notice must also include "a domestic contact telephone and facsimile number for the recipient to transmit such a request to the sender" as well as a "cost-free mechanism for a recipient to transmit a request pursuant to such notice ..." 47 U.S.C. § 227(b)(2)(D)(iv).

71.     "A notice contained in an unsolicited advertisement complies

with the requirements under this subparagraph only if ... (v) the telephone and facsimile machine numbers and the cost-free mechanism ... permit an individual or business to make such a request at any time on any day of the week." 47 U.S.C. § 227(b)(2)(D)(v).

72.    The FCC's regulations pertaining to opt-out notices on unsolicited advertisements are set forth at 47 C.F.R. § 64.1200(a)(4)(iii).

73.    Exhibit A advertises the commercial availability or quality of Scratch's property, goods, or services.

74.    Scratch sent Exhibit A to Plaintiff by facsimile without Plaintiff's prior express invitation or permission.

75.    Exhibit A does not have an opt-out notice that is compliant with the requirements of 47 U.S.C. § 227.

76.    Plaintiff intends to discover and include within this case all unsolicited advertisements Scratch sent by fax. *See* Exhibit C, a Demand for Preservation of All Tangible Documents Including Electronically Stored Information.

77.    Scratch violated 47 U.S.C. § 227 *et seq.* by sending advertisements by fax to Plaintiff and others without their prior express invitation or permission and, to the extent Scratch will contend it sent

facsimiles based on EBRs with the intended recipients, by failing to include compliant opt-out notices on those otherwise unsolicited fax advertisements.

78.     Facsimile advertising imposes burdens on unwilling recipients that are distinct from those imposed by other types of advertising. The content of the required opt-out notice is designed to ensure that the recipients know how to prevent and avoid future fax transmissions of advertising material, and to provide the various cost-free means Congress required. If senders do not clearly and conspicuously provide the opt-out content to the recipients, including informing them of the requirements for making a successful opt-out request, the penalty for failing to comply with their opt-out request, and that the opt-out request can be overridden by subsequent express consent, and comply with their requests when made, then the recipients are unable to avoid the burdens imposed by this form of advertisement.

79.     The TCPA is a strict liability statute and Scratch is liable to Plaintiff and the other class members even if its actions were negligent.

80.     Scratch is liable because it sent the faxes, caused the faxes to be sent, participated in the activity giving rise to and/or constituting the

violation, the faxes were sent on its behalf, and/or under general principles of vicarious liability applicable under the TCPA, including actual authority, apparent authority, and ratification.

81.   Scratch knew or should have known that Plaintiff and the other class members had not given express invitation or permission for Scratch or anybody else to send advertisements by facsimile and that Scratch's faxes either did not display the opt-out notice required by the TCPA (including the FCC's regulations), or displayed a non-compliant opt-out notice that did not have the required language or make available the means Congress intended to make such an opt-out request.

82.   Scratch's actions caused damages to Plaintiff and the other class members. Receiving Scratch's junk faxes caused most recipients to lose paper and toner consumed in the printing of Scratch's faxes. Moreover, the subject faxes used Plaintiff's and the class's fax machines, blocked the sending and receiving capacity of the machine, increased costs associated with operating and maintaining a fax machine, and wasted valuable time. Scratch's faxes unlawfully interrupted Plaintiff's and the other class members' privacy interests in being left alone. Finally, the injury and property damage sustained by Plaintiff and the

other class members from the sending of the faxes occurred outside Scratch's premises.

83.    Even if Scratch did not intend to cause damage to Plaintiff and the other class members, did not intend to use their paper and toner, did not intend to assume control of their fax machines by blocking their fax sending and receiving capacity, did not intend to violate their privacy, did not intend to waste the recipients' valuable time with Scratch's advertisements, and did not intend to increase their costs associated with operating and maintaining a fax machine, those facts are irrelevant because the TCPA is a strict liability statute.

84.    The Court, in its discretion, can treble the statutory damages if the violation was knowing or willful and Plaintiff requests trebling. 47 U.S.C. § 227.

WHEREFORE, Plaintiff demands judgment in favor of itself and all others similarly situated and against Scratch as follows:

A.    That the Court adjudge and decree that the present case may be properly maintained as a class action, certify a class, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.     That the Court award $500 in statutory damages for each of Scratch's violations of the TCPA;

C.     That the Court treble the statutory damages to $1,500 per violation if it finds that Scratch knowingly or willfully violated the TCPA;

D.     That the Court enter an injunction prohibiting Scratch from sending any advertisement by fax without first demonstrating that it has obtained express invitation or permission to fax advertisements; and

E.     That the Court award costs, expenses and attorney fees on the conversion claim, and such further relief as the Court deems just and proper.

Respectfully submitted,

ALICE SOWDERS, DVM d/b/a FAIRBORN ANIMAL HOSPITAL, individually and on behalf of all similarly-situated persons,

By: /s/ Scott D. Simpkins
    One of their attorneys

Scott D. Simpkins
CLIMACO, WILCOX, PECA & GAROFOLI CO., LPA
55 Public Square, Suite 1950
Cleveland, OH 44113
Telephone: 216-621-8484
Email: sdsimp@climacolaw.com

Phillip A. Bock (*pro hac vice* to be applied for)
BOCK HATCH & OPPENHEIM, LLC
820 W. 41st St., #305
Miami Beach, FL 33140
Telephone: 305-239-8726
Email: service@classlawyers.com